UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AARON LAMONT STRIBLING,

        Plaintiff,

      v.

CORRECTIONAL OFFICER S. PICAZO, et al.,

        Defendants.

Case No. 15-cv-03337-YGR (PR)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT; AND REFERRING MATTER FOR SETTLEMENT PROCEEDINGS**

## I.   INTRODUCTION

Plaintiff Aaron Lamont Stribling, a state prisoner currently incarcerated at California State Prison - Sacramento, has filed the instant *pro se* civil rights complaint under 42 U.S.C. § 1983 stemming from constitutional violations that took place at Salinas Valley State Prison ("SVSP"), where he was previously incarcerated.  Dkt. 1.  Specifically, Plaintiff alleged claims of excessive force as well as deprivation of food for two days in December 2013 against the following Defendants: SVSP Sergeant R. Poodry; and SVSP Correctional Officers Brown, Giudino, Rodriguez, Aldaino, S. Picazo, V. Franco, O. Aragon, L. Baez and Valles.  *Id.* at 2-3.[1]

The following is taken from the Court's January 13, 2016 Order of Partial Dismissal and Service:

> Plaintiff alleges that on December 23, 2013, he was subjected to excessive force by Defendants Picazo, Franco, Valles, Aragon and Poodry.  Specifically, Plaintiff alleges that the aforementioned Defendants "came with a shield [and] signaled [Defendant] Baez to open the door to [Plaintiff's cell]."  Dkt. 1 at 3.  Plaintiff alleges that "they all came in [his cell] and started punching on [him]."  *Id.*  He adds that "they didn't have a video camera or a captain present during the cell extraction."  *Id.*

Dkt. 4 at 2.  Meanwhile, as to his claim of a denial of food on December 22 and 23, 2013, Plaintiff alleges that Defendants' justification for denying him food was because he had withheld his tray after complaining about missing items at breakfast on December 22, 2013.  Dkt. 1 at 3.  Plaintiff

---

[1] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

1    claims that Defendants "could have served me food in paper bags by they didn't the next day 12-

2    23-13." *Id.*

3          After liberally construing Plaintiff's aforementioned allegations regarding the use of

4    excessive force on December 23, 2013, the Court found that Plaintiff stated a cognizable Eighth

5    Amendment claim against Defendants Picazo, Franco, Valles, Aragon, and Poodry, as well as a

6    claim of failure to intervene against Defendant Baez.  *Id.*  The Court found that the conclusory

7    allegations in his complaint relating to the denial of food failed to state a cognizable claim of a

8    violation of his constitutional rights, stating:

9              [C]onclusory allegations of culpability do not suffice.  *See Keenan*
               *[v. Hall]*, 83 F.3d [1083,] 1091 [(9th Cir. 1996)].  In addition, while
10             adequate food is a basic human need protected by the Eighth
               Amendment, *see id.*, the denial of food for two days in this case
11             does not present a sufficiently serious condition to meet the
               objective prong of the Eighth Amendment deliberate indifference
12             analysis. *See, e.g.*, *Foster v. Runnels*, 554 F.3d 807, 812 n.1 (9th Cir.
               2009) (denial of two meals over nine-week period was not
13             sufficiently serious to meet objective prong of Eighth Amendment
               deliberate indifference); *cf. id.* at 812 (denial of sixteen meals over
14             twenty-three days was "sufficiently serious deprivation because food
               is one of life's basic necessities"). Therefore, the Court finds that
15             Plaintiff's allegations in his complaint relating to the denial of food
               fail to state a cognizable claim of a violation of his constitutional
16             rights. The Court DISMISSES Plaintiff's claim relating to the denial
               of food against Defendants Brown, Giudino, Rodriguez and
17             Aldaino.

18   *Id.* at 3.

19         The parties are presently before the Court on Defendants' Motion for Summary Judgment

20   as to the remaining Eighth Amendment excessive force claim stemming from the December 23,

21   2013 incident.  Dkt. 18.  Plaintiff has filed an opposition to Defendants' motion, along with a

22   cross-motion for summary judgment.  Dkt. 34.  Defendants have filed a reply to the opposition,

23   and they have indicated that they oppose Plaintiff's cross-motion.  Dkt. 36.

24         Also before the Court is Plaintiff's "Motion to Exclude Off the Record the 6-9-16

25   Deposition of Plaintiff, and the 7-19-16 Correction Letter of His 6-9-16 Deposition."  Dkt. 32.

26   Defendants have filed an opposition to Plaintiff's aforementioned motion.  Dkt. 33.  Plaintiff

27   argues that Defendants' counsel acted improperly by filing Plaintiff's errata sheet with the relevant

28   portions of the deposition transcript.  *Compare* Dkt. 28-1 at 1-105 (Pl.'s Dep.) *with id.* at 106

*United States District Court*
*Northern District of California*

("Letter to Deposition Officer/Errata Sheet"). Instead, Plaintiff contends, his corrections should have been interlineated within the transcript. Dkt. 32 at 1. However, Plaintiff misinterprets the applicable Federal Rule of Civil Procedure, Rule 30(e)(1)(B), which requires the deposition officer to honor Plaintiff's request for an opportunity to make changes to the transcript and "attach an changes the deponent makes" to the transcript. *See* Fed. R. Civ. P. 30(e)(1)(B). Rule 30(e)(1)(B) does not require that the deposition officer interlineate Plaintiff's changes—nor does it require interlineation by Defendants' counsel. Accordingly, Plaintiff's motion is DENIED.[2] Dkt. 32.

Having read and considered the papers submitted, and being fully informed, the Court GRANTS in part and DENIES in part Defendants' motion for summary judgment, and DENIES Plaintiff's cross-motion for summary judgment. The Court refers this matter to the Pro Se Prisoner Settlement Program.

## II.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.    Factual Background

The following facts are undisputed unless otherwise noted.

#### 1.    The Parties

At the time of the events set forth in his complaint, Plaintiff was a state prisoner who was incarcerated in the administrative segregation unit ("ad-seg") at SVSP. Dkt. 1 at 3; Low Decl., Ex. A (Pl.'s Dep.) 76:11-21. Also during the same time frame, Defendant Poodry was the sergeant on duty and the remaining Defendants were correctional officers at SVSP. Franco Decl. ¶ 1, Picazo Decl. ¶ 1; Aragon Decl. ¶ 1; Poodry Decl. ¶ 4.

#### 2.    Ad-Seg

The December 23, 2013 incident happened in and around Plaintiff's cell, which was cell 230, in C-Section of Building D2 in ad-seg.   Pl.'s Dep. 76:11-21; Poodry Decl. ¶¶ 5, 8-10. Ad-seg is housing for inmates whose presence in an institution's general population setting presents an immediate threat to the safety of the inmate, others, or the institution. Poodry Decl. ¶¶ 6-7.

---

[2] The Court has reviewed Plaintiff's "Letter to Deposition Officer/Errata Sheet," and it notes that Plaintiff did not make corrections to any of his deposition transcript pages cited below in this Order. *See* Dkt. 28-1 at 106.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    In ad-seg, all meals are served and consumed within the inmate's assigned cell.  *Id.*  ¶ 11;

2    Pl.'s Dep. 83:8-84:8.  Two meals on trays (breakfast and dinner) and one sack lunch are served

3    daily.  *Id.*  Plaintiff explains the rationale behind in-cell meal service as follows: "[Prison officials]

4    have to maintain safety [and] security of the prison.  It's dangerous inmates that are housed in [ad-

5    seg], so they have to keep everybody separated.  The only way they can do that is by leaving them

6    in the cells or taking them out by themselves."  Pl.'s Dep. 84:25-85:5

7    Cells in ad-seg are equipped with food/cuff ports that are used by staff to administer meals

8    and also to apply and remove handcuffs.  Poodry Decl. ¶ 12; Pl.'s Dep. 83:8-10; Salao Decl., Exs.

9    C, D (photographs of the door for cell 230).  Inmates who take control of food/cuff ports create

10    serious safety concerns for staff and mandate immediate suspension of the programming of the

11    other inmates housed in the unit.  Poodry Decl. ¶¶ 13-14.

### 3.    Alleged Denial of Food on December 22, 2013 and December 23, 2013

13    Plaintiff claims that, on December 22, 2013, a correctional officer distributed a breakfast

14    tray that did not contain what Plaintiff believed to be a sufficient "daily caloric intake" because it

15    was missing some food items.  Dkt. 1 at 3; Pl.'s Dep. 72:18-24.  Plaintiff complained and asked

16    two different officers to contact the kitchen to have them replace the missing items, but they

17    refused.  Pl.'s Dep. 72:24-73:11.  Plaintiff then withheld his food tray in protest.  *Id.* 73:9-11.

18    Accountability for food trays is also a safety concern tied to the security of the institution.

19    Poodry Decl. ¶ 14.  Staff issuing food trays to inmates in cells must account for all trays after the

20    meal is concluded.  *Id.*  On occasion, inmates have refused to relinquish their food trays in an

21    effort to circumvent established procedures by attempting to air grievances improperly.  *Id.*  Per

22    policy, trays inmates refuse to relinquish to staff will not be recognized as negotiating or

23    bargaining tools.  *Id.*  If an inmate refuses an order to return his food tray, staff will not provide

24    another meal on a plastic tray until the held tray is returned.  *Id.*

25    Because Plaintiff refused to return his tray after breakfast on December 22, 2013, Plaintiff

26    did not receive lunch or dinner on that day.  Pl.'s Dep. 73:3-11.

27    On December 23, 2013, Plaintiff claims that before breakfast, he yelled from his cell and

28    offered to return his tray to Defendant Picazo, who was "standing in the doorway of the section."

4

*Id.* 73:12-15.  Defendant Picazo "said no, we got it out for you for what you did to our officers yesterday." *Id.* 73:15-16.  Plaintiff did not receive breakfast that day. *Id.* 73:16-17.  Afterwards, when Defendant Franco was collecting breakfast trays and passing out sack lunches, Plaintiff requested for two lunches "to supplement the fact [he] didn't get a breakfast tray, that it was not [his] fault." *Id.* 90:5-91:5.  Defendant Franco offered him one lunch, not two. *Id.* 91:6-11.  Plaintiff declined the offer because "it was not fair." *Id.* 91:12-15.  Defendant Franco asked for the tray back, and Plaintiff refused to give it to him. *Id.* 91:20-92:8.  When asked at his deposition why he refused, Plaintiff explained: "Because [Defendant Franco] was not willing to give me two sack lunches because I didn't get a breakfast tray and it was not my fault." *Id.* 92:7-12.

### 4. The December 23, 2013 Incident

On December 23, 2013, Licensed Vocational Nurse C. Zavala was distributing morning medication to ad-seg inmates through the food/cuff port in their cells.  Pl.'s Dep. 93:1-94:22.  At around 8:38 a.m., Nurse Zavala told Defendant Franco that Plaintiff reported suicidal thoughts while morning medication was being delivered.[3]  Franco Decl. ¶¶ 4, 6, Ex. A; Picazo Decl. ¶ 4, Ex. A; Poodry Decl. ¶ 15, Ex. A.  Defendant Franco then approached Plaintiff's cell and ordered him to submit to an unclothed body search and to submit to handcuffs.  Franco Decl. ¶ 5.  Plaintiff walked away from the front of the cell to the back of the cell. *Id.*  Defendant Franco gave the same order to Plaintiff, but Plaintiff stayed at the back of the cell and did not respond to Defendant Franco's orders. *Id.*  Defendant Franco asked Defendant Picazo to notify the on-duty Sergeant, Defendant Poodry, while Defendant Franco continued to watch Plaintiff. *Id.* ¶¶ 6-7.  Plaintiff began to use loose paper to cover up his cell windows, which consisted of three thin rectangular-shaped windows—two on his door and one to the right of his door. *Id.* ¶ 7; Salao Decl., Exs. C, D

---

[3]  According to Plaintiff, he does not recall saying anything to Defendant Zavala on December 23, 2013.  Pl.'s Dep. 95:17-18.  In his opposition, Plaintiff counters that if had he reported any suicidal thoughts on that day, then "[h]ow come [he] never went to suicide watch that day?" Dkt. 34 at 4.  However, Defendants argue that "this statement is not being offered for the truth of the matter," but "[r]ather, . . . for its effect on [Defendant] Franco." Dkt. 18 at 10 footnote 1.  Defendants add that "Plaintiff has no personal knowledge to dispute whether Nurse Zavala told [Defendant] Franco that Plaintiff reported suicidal ideations." *Id.*  Because such a statement, while disputed, is not being offered for the truth of the matter asserted then the Court will consider it and includes it in this factual background section.

(photographs of the door for cell 230).  Defendant Franco ordered Plaintiff to stop, but to no avail. Franco Decl. ¶¶ 7, 9.

Defendant Picazo notified Defendant Poodry that Plaintiff was suicidal and that he refused to submit to an unclothed body search.  Picazo Decl. ¶ 4.  At the time he was notified, Defendant Poodry knew Plaintiff had previously been admitted to the Correctional Treatment Center for suicide precautions and had been received by ad-seg after being discharged from the Mental Health Crisis Bed ("MHCB")[4] unit.[5]  Poodry Decl. ¶¶ 15-16, 38, Ex. A.

Defendant Poodry responded to Plaintiff's cell and arrived there along with Defendants Picazo and Aragon.  *Id.* ¶ 17; Franco Decl. ¶¶ 8-9.  Defendant Poodry stated that when he arrived, Plaintiff's "cell windows were covered and [he] was unable to see inside the cell."  Poodry Decl. ¶ 17.  Defendant Poodry identified himself and directed Plaintiff to uncover his windows, submit to an unclothed body search, and submit to handcuffs so he could exit the cell.  *Id.*  Plaintiff did not uncover his windows.  *Id.*  Defendant Poodry looked for "other means to get a visual assessment of [Plaintiff's] safety."  *Id.*  Defendant Poodry looked through a crack between the cell door and the wall, but "could see nothing but white cotton crammed into the small opening."  *Id.* While Defendant Poodry was assessing the front of Plaintiff's cell, he heard a "dull thud" and did not hear any further sounds from inside the cell door.  *Id.* ¶ 18.  Defendant Poodry instructed staff to bring in a shield and prepare to make an emergency cell entry.  *Id.* ¶ 19; Franco Decl. ¶ 13; Aragon Decl. ¶ 8; Picazo Decl. ¶ 10.

---

[4] The MHCB unit provides an elevated level of care to inmates who are experiencing acute psychiatric symptoms leading to marked impairment and dysfunction, dangerousness to others, or dangerousness to self.  Brock Decl. ¶ 3 in Case No. C 15-03336 YGR (PR).

[5] In another civil rights action filed by Plaintiff, Case No. C 15-03336 YGR (PR), he claimed he attempted suicide in ad-seg at SVSP on August 23, 2013 by overdosing on pills he had stockpiled from other inmates. Dkt. 1 in Case No. C 15-03336 YGR (PR) at 3.  Plaintiff was admitted to the MHCB unit for eleven days.  *Id.*  Plaintiff further claimed he attempted to commit suicide two more times on September 3, 2013 and September 4, 2013, before SVSP mental health staff discharged him to ad-seg on September 5, 2013.  *Id.*  He claimed that SVSP mental health staff did not respond appropriately by discharging him and alleged a claim of deliberate indifference to medical needs for their failure to provide him with adequate mental health treatment.  *Id.*  In an Order dated March 10, 2017, the Court granted Defendants' motion for summary judgment (that had been filed as to his deliberate indifference claim) and entered judgment in favor of Defendants in Case No. C 15-03336 YGR (PR).  *See* Dkts. 29, 30 in Case No. C 15-03336 YGR (PR).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Plaintiff does not specifically dispute the facts above *leading up to* the cell extraction in

2   either his verified complaint or verified opposition, but instead he begins his description of the

3   incident with the officers coming up the stairs with a shield.  *See* Dkts. 1, 34.  According to

4   Plaintiff, Defendants Aragon, Franco, Picazo, Poodry, and Valles came up the stairs to his cell on

5   the second tier with a shield.  Pl.'s Dep. 73:19-22.  He "had been [involved] in [a] cell extraction

6   before" and so he assumed that a cell extraction was underway.  *Id.* 73:22-24.  He knew that "one

7   of the tactics they use is to use pepper spray before they charge in [the cell]."  *Id.* 73 25-74:1.

8   Plaintiff claims that as the officers were coming upstairs, he used his mattress to block his

9   food/cuff port on his cell door.  *Id.* 75:1-8.  Plaintiff held his mattress against his cell door to

10  "prevent getting sprayed" with pepper spray.  *Id.* 75:3-8.

11   Defendant Poodry states that officers "placed the shield in front of the food/cuff port so the

12  port could be opened to check on [Plaintiff's] condition."  Poodry Decl. ¶ 19.  Defendant Poodry

13  states that it was his practice to have the shield placed in front of the post to ensure staff safety

14  because "[i]nmates can use an open food/cuff port to attack officers by reaching through the port

15  of by projecting things from inside their cell."  *Id.* ¶ 20.  Once the food/cuff port was opened,

16  Defendant Poodry states that "the entire opening was completely obstructed by what appeared to

17  be a mattress, covered by a white sheet."  *Id.* ¶ 21.  "Without any communication with [Plaintiff]

18  and with his history of suicidal threats, [Defendant Poodry] initiated a "Code 1"[6] alarm and

19  informed Central Control that there was a medical emergency at cell 230."  *Id.* ¶ 22.  Defendant

20  Picazo activated his personal alarm device.  Picazo Decl. ¶ 10.

21   Defendant Poodry then signaled the control booth operator, Defendant Baez, to open

22  Plaintiff's cell door.  Poodry Decl. ¶ 23; Baez Decl. ¶ 10; Pl.'s Decl. 75:10-11.

23   When the cell door opened, Plaintiff "dropped [his] mattress and [he] used [his] weight to

24  try to push [the officers] onto the tier while they [were] using their weight to try to push [him] to

25  the back of [his] cell."  Pl.'s Dep. 74:12-15.  Specifically, Plaintiff claims he threw the mattress on

26  the ground and "placed [his] whole body against the shield."  *Id.* 123:5-25.

27

28

---

6 A "Code 1" means "non-responsive inmate."  Baez Decl. ¶ 9; Picazo Decl. ¶ 10.

At this point, the facts relating to the altercation inside Plaintiff's cell during the December 23, 2013 incident are in dispute. Therefore, the Court will state each parties' version of the events.

### a. Plaintiff's Version Relating to Altercation Inside Cell and His Injuries

According to Plaintiff, all five officers entering his cell were pushing their weight directly against the shield. *Id.* 125:9-127:4. Plaintiff kept all five officers from entering his cell with his own physical strength. *Id.* 129:22-130:16. Plaintiff explained that he was stronger than the five officers, and that is how he was able to keep them out of his cell. *Id.* 130:11-16. The officers and Plaintiff were at a standstill for a few minutes. *Id.* 130:2-7. When asked at his deposition why he was pushing back on the shield, Plaintiff explained: "Because I didn't want them to come into my cell. I wanted to defend myself." *Id.* at 130:8-10. Plaintiff could not have laid down on the ground with his hands behind his head because he "didn't want to subject [himself] to being beaten without first putting up a fight." *Id.* 130:17-22. Plaintiff further explained, besides pushing against the shield, he was "going to do whatever it took to fight [the officers] off," including hitting, kicking, biting, head-butting, spitting, "elbowing, kneeing, and pushing." *Id.* 132:13-133:13. Ten to twelve additional officers then responded to the scene. *Id.* 133:22-134:1. Each one of these additional officers put their hands on the shield such that fifteen to seventeen officers now had their hands on the shield. *Id.* 134:20-135:17. These fifteen to seventeen officers all pushed on the shield, causing to Plaintiff to backpedal into his cell and drop to the floor near the back of his cell. *Id.* 135:18-25. When Plaintiff initially went to the ground, he was "curled up," lying on his left side, with his head toward the back of the cell, facing the bedside and his arms blocking his face. *Id.* 136:6-138:19. Once the officers entered the cell, Defendants Franco and Picazo began "punching" and "hitting" him "on the upper body, whole body, [and] mid section" while Plaintiff kept his hands in front of him to block them before they forced his hands behind his back and placed handcuffs on him. *Id.* 143:18-23; 145:3-10, 147:15-20, 148:2-16. Plaintiff was punched by Defendants Franco and Picazo around "30 times"—15 times with his hands in front of him and 15 times after his hands were behind his back. *Id.* 150: 11-23. While punching him, Defendant Franco used "profanity towards [Plaintiff]" and was "cussing like a sailor" while Plaintiff did not say anything back. *Id.* 149:5-16. Defendant Picazo also used profanity towards

Plaintiff while punching him. *Id.* 151:3-10. Plaintiff thinks Defendant Franco spit on his face. *Id.* 151:13-20. Plaintiff claims Defendant Aragon was "laying [sic] diagonally across [Plaintiff's] back" and "choking [him]" with "[Defendant Aragon's] arm around [his] neck." *Id.* 143:10-145:2. An officer who he could not identify "put cuffs on [his] wrists real tight." *Id.* 153:10-13. Plaintiff states he was lying on his stomach while he was being handcuffed. *Id.* 163:23-25. While he was lying "flat" on his stomach, he recognized Defendant Valles's voice (but did not see her at that point[7]) and "felt both of [her] hands twisting [his] legs." *Id.* 156:19-157:23, 159:6-16. While Plaintiff was on his stomach, he was "kicked . . . below the waist" but he was "not sure" who kicked him. *Id.* 162:14-16. Plaintiff claims he could have been kicked by Defendant Valles and Defendant Picazo. *Id.* 162:19-163:3. Plaintiff is also not sure if he was "hit" by Defendant Poodry. *Id.* 153:16-25. Plaintiff claims the incident came to an end when Lieutenant Martinez said, "that is enough." *Id.* 163:16-18. At that point, Plaintiff states that Defendant Aragon got off his back. *Id.* 164:24-25. A spit net was placed over Plaintiff's head, shackles were placed on his ankles, and he was placed in a holding cell. *Id.* 163: 13-22.

**b. Defendants' Version Relating to the Altercation Inside Plaintiff's Cell**

As the cell door opened, Defendant Aragon began to attempt entry into the cell. Aragon Decl. ¶ 10. Simultaneously, Plaintiff moved towards Defendant Aragon in "an aggressive manner attempting to force his way out of the cell." *Id.* Defendant Aragon was able to stop Plaintiff's progress out of the cell by utilizing the extraction shield. *Id.* However, Defendant Aragon was unable to drive Plaintiff back to the back of the cell because the cell door got jammed halfway open, and Defendant Aragon could not safely enter the cell. *Id.* Defendant Aragon claims that Plaintiff then grabbed the top of the extraction shield with his left hand and tried to force it down. *Id.* ¶ 11. As Plaintiff did so, he "began to reach over the shield and [Defendant Aragon's] head, and inadvertently grazed the top of [Defendant Aragon's] head." *Id.*

Defendant Franco pulled the cell door to force it completely open. Franco Decl. ¶ 15.

---

[7] In his verified opposition, Plaintiff claims that he "saw [Defendant Valles] at his cell door behind the shield with the rest of the Defendants . . . ." Dkt. 34 at 5. Plaintiff also claims that he could recognize Defendant Valles's voice because she worked in the same block in a location where he was celled for 8 months. *Id.*

United States District Court
Northern District of California

1    Defendants Aragon and Picazo forced Plaintiff back inside the cell.  Aragon Decl. ¶ 13; Picazo

2    Decl. ¶ 13.  Defendant Aragon saw Plaintiff trip over the mattress on the floor and fall head first

3    onto the cell floor.  Aragon Decl. ¶ 14.  Defendant Aragon's forward momentum carried him

4    forward, and he also tripped on the same mattress and fell on top of Plaintiff.  *Id.*  Defendant

5    Aragon landed on top of Plaintiff with the extraction shield over his upper torso.  *Id.*  Plaintiff

6    attempted to turn towards his right side by thrashing his upper body and "continuing to be

7    combative." *Id.* ¶ 15.  Defendant Picazo claims that Plaintiff was "attempting to turn on his back

8    to strike [the officers]."  Picazo Decl. ¶ 14.  Defendant Franco claims that Plaintiff "continued

9    being resistive by kicking both legs up and down," "thrashing his upper body," as well as

10   "swinging his fists in an up and down and side to side motion[]."  Franco Decl. ¶ 17.  Defendant

11   Franco ordered Plaintiff to place his hands behind his back and submit to handcuffs, but Plaintiff

12   ignored these orders and refused to put his hands behind his back.  Franco Decl. ¶ 17; Picazo Decl.

13   ¶ 14.  Defendant Picazo was able to gain control of Plaintiff's right arm and placed one cuff on his

14   right wrist.  Picazo Decl. ¶ 15.  Plaintiff initially continued to "resist" by not placing his left hand

15   behind his back.  *Id.*  Defendant Aragon forced Plaintiff down onto his stomach by "utilizing the

16   extraction shield and [his] body weight," reached under the shield, and gained control of Plaintiff's

17   left hand.  Aragon Decl. ¶ 16.  Plaintiff then became "compliant" and, when he placed his left

18   hand behind his back, Defendant Picazo placed Plaintiff in handcuffs with the assistance of

19   Defendant Aragon.  Picazo Decl. ¶ 15.  Defendant Aragon maintained control of Plaintiff's left

20   upper torso as Defendant Picazo continued to maintain control of Plaintiff's right upper torso.  *Id.*

21   ¶ 16.  Defendant Franco took control of Plaintiff's legs by placing one hand on each leg and

22   pushing them down on the floor with his strength.  Franco Decl. ¶ 19.  Defendant Franco placed

23   leg restraints on Plaintiff.  *Id.*  This is contrary to Plaintiff's statements that Defendant Valles was

24   present at the scene and twisted his leg, and Defendants have submitted evidence purportedly

25   showing that Defendant Valles was not involved in the incident because she was not named in

26   Lieutenant Martinez's incident report.[8]  *See* Hill Decl., Ex. B, Dkt. 26-2 at 3.

27   _____

28        [8]  The Court notes that Defendant Valles did not submit a declaration in support of
     Defendants' Motion for Summary Judgment.  The only evidence submitted that this Defendant

     10

Once Plaintiff was handcuffed and in leg restraints, Defendant Poodry instructed responding staff (not named as Defendants in this action) to escort Plaintiff to a temporary holding cell so that he could be assessed by the medical staff.  Poodry Decl. ¶ 30

### 5.  Plaintiff's Injuries

While Plaintiff was in the holding cage, Nurse Zavala examined him.  *Id.* Pl.'s Dep. 172:6-17.  In the Medical Report of Injury prepared by Nurse Zavala, under the section labeled "Brief Statement in Subject's Words of the Circumstances of the Injury or Unusual Occurrence," Plaintiff stated: "I'm suicidal, they didn't want to feed me breakfast."  *See* Hill Decl., Ex. A, Dkt. 26-1 at 1.  Additionally, Nurse Zavala noted: "[Plaintiff] claim[ed] to be hit in the left eye during cell extraction.  No visible injuries noted [at] this time."  *Id.*

Meanwhile, Plaintiff claims he told Nurse Zavala the following relating to his injuries: "My wrist hurt.  My leg hurt.  My head hurt."  Pl.'s Dep. 172:22-25.  Plaintiff claims his left wrist was injured and there were "cut marks" that were the "width of the cuffs" on his wrist.  *Id.* 173:17-175:2.  Plaintiff also had a "gash" on his right thigh and a "scrape on the eye."  *Id.* 175:3-6.

During Plaintiff's deposition, after being shown his picture from the video interview on the day of the incident, he noted that the scrape was on the "left side of the face."  *Id.* 181:1-183:1.  Plaintiff did not receive any treatment for the scrape on his eye, and is not sure if he provided any treatment himself.  *Id.* 178:17-22.  Plaintiff is not sure how long the scratch took to heal, but he thinks it was between 10 to 20 weeks.  *Id.* 178:1-25.

As to the "gash" or what he agreed to call a "scratch" on his thigh, Plaintiff claims that it was located on the front of his right thigh, and he is not sure how the scratch looked.  *Id.* 175:7-15; 175:24-176:1.  He recalls the scratch was not bleeding but believes it cracked his skin.  *Id.* 175:19-20.  He is not sure how long the scratch took to resolve.  *Id.* 176:22-177:5.  He recalls treating the scratch himself with an alcohol pad and a Band-Aid.  *Id.* 177:11-25.  Plaintiff's medical records indicate that on December 25, 2013, he complained of the "gash" to his thigh as causing him "a

---

was allegedly not involved in the incident is Lieutenant Martinez's incident report dated December 23, 2013, which was attached in support of Defendants' motion for summary judgment. *See* Hill Decl., Ex. B, Dkt. 26-2 at 3.

United States District Court
Northern District of California

1    great deal of pain." *See* Kumar Decl. Ex. A, Dkt. 27-1 at 2.

2        Lastly, Plaintiff claims his left wrist hurt after the December 23, 2013 incident. *Id.* 173:17-

3 19. He describes "welps [sic]" on his wrist that looked like cut marks all around his wrists that

4 were the "width of cuffs." *Id.* 174:4-175:2. Plaintiff believes the injury resolved a little after six

5 months, and he is certain it resolved within one year. *Id.* 35:1-14. Plaintiff treated his left wrist

6 injury by not applying pressure on it and by taking pain medication, including Tylenol with

7 codeine, Ibuprofen, and Advil, during the one-year it took to heal. *Id.* 35:15-36:7.

8        A review of Plaintiff's medical records from December 2013 to December 2014 revealed

9 the following six medical records relating to pain in Plaintiff's left wrist. *See* Kumar Decl. ¶ 9,

10 Exs. A-B, Dkts. 27-1, 27-2.

11       - On December 25, 2013, Plaintiff complained of left-wrist "pain" and "numbness" (as

12 well as pain from the gash on his thigh, as explained above). Dkt. 27-1 at 2. On December 27,

13 2013, Plaintiff was evaluated and exhibited an abrasion to the area, and no swelling, and "full

14 range of motion to both hands." *Id.* No special treatment was noted. *Id.*

15       - On January 2, 2014, Plaintiff complained that his left hand was hurting." Dkt. 27-2 at 2.

16 On January 3, 2014, Plaintiff was evaluated and exhibited healed abrasions on his wrists, no

17 swelling, and a limited range of motion due to pain. *Id.* He was offered pain medicine and

18 refused, stating "I want pain med[s] that will help and I've already had Motrin before and it barely

19 even help[ed]." *Id.*

20       - On January 17, 2014, Plaintiff again complained that his left hand is "still hurting." *Id.* at

21 3. On January 19, 2014, Plaintiff was evaluated and exhibited a healed abrasion, no swelling, and

22 a limited range of motion due to pain. *Id.* He was once again offered pain medicine and refused

23 stating, "It doesn't help." *Id.*

24       - On February 12, 2014, Plaintiff was seen by his primary care provider. *Id.* at 4.

25 Plaintiff's spoke with the doctor about his injury to his left wrist "developed from tight handcuffs

26 about 1 month ago." *Id.* An x-ray was ordered. *Id.*

27       - On February 25, 2014, Plaintiff's left hand was x-rayed, and no abnormality was noted.

28 *Id.* at 5.

*(left margin, vertical text)* United States District Court / Northern District of California

1    - On or around March 3, 2014, another primary care provider reviewed the x-ray results

2    with Plaintiff. *Id.* at 6. Plaintiff acknowledged that he understood what was being explained to

3    him. *Id.* No further treatment for Plaintiff's left hand was noted. *Id.*

4    **B.    Legal Standard**

5    Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

6    that there is "no genuine issue as to any material fact and that the moving party is entitled to

7    judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the

8    outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a

9    material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

10   the nonmoving party. *Id.*

11   The party moving for summary judgment bears the initial burden of identifying those

12   portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine

13   issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving

14   party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

15   reasonable trier of fact could find other than for the moving party. On an issue for which the

16   opposing party by contrast will have the burden of proof at trial, as is the case here, the moving

17   party need only point out "that there is an absence of evidence to support the nonmoving party's

18   case." *Id*. at 325.

19   Once the moving party meets its initial burden, the nonmoving party must go beyond the

20   pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

21   genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over

22   material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted."

23   *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine

24   issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party

25   has the burden of identifying, with reasonable particularity, the evidence that precludes summary

26   judgment. *Id*. If the nonmoving party fails to make this showing, "the moving party is entitled to

27   a judgment as a matter of law." *Celotex*, 477 U.S. at 323.

28   For purposes of summary judgment, the court must view the evidence in the light most

13

United States District Court
Northern District of California

1    favorable to the nonmoving party; if the evidence produced by the moving party conflicts with

2    evidence produced by the nonmoving party, the court must assume the truth of the evidence

3    submitted by the nonmoving party.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

4    The court's function on a summary judgment motion is not to make credibility determinations or

5    weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec. Serv., Inc. v.*

6    *Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  When the parties file cross-

7    motions for summary judgment, the district court must consider all of the evidence submitted in

8    support of both motions to evaluate whether a genuine issue of material fact exists precluding

9    summary judgment for either party.  *The Fair Housing Council of Riverside County, Inc. v.*

10   *Riverside Two*, 249 F.3d 1132, 1135 (9th Cir. 2001).

11          A district court may only consider admissible evidence in ruling on a motion for summary

12   judgment.  *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

13   In support of the motion for summary judgment, all Defendants except Defendant Valles have

14   presented their own declarations as well as a declaration from their attorney, Sara D. Van Loh,

15   Esq., Correctional Officer R. Salao, SVSP Use of Force Coordinator E. Hill, and SVSP Chief

16   Medical Executive R. K. Kumar, M.D. along with various supporting exhibits.  Dkts. 20-28.

17   Meanwhile, Plaintiff has filed his verified complaint and opposition.  Dkts. 1, 24.  The Court

18   construes his complaint as an affidavit under Federal Rule of Civil Procedure 56, insofar as it is

19   based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder*

20   *v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

21          **C.    Discussion**

22                 **1.    Excessive Force**

23          To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison

24   conditions must involve "the wanton and unnecessary infliction of pain."  *Rhodes v. Chapman*,

25   452 U.S. 337, 347 (1981).  Whenever prison officials stand accused of using excessive force in

26   violation of the Eighth Amendment, the deliberate indifference standard is "inappropriate."

27   *Hudson v. McMillian*, 503 U.S. 1, 6 (1992).  Instead, the core judicial inquiry is "whether force

28   was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically

United States District Court
Northern District of California

14

1    to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *Whitley v. Albers*, 475 U.S. 312,

2    320 (1986).  Factors that can be considered are "the need for the application of force, the

3    relationship between the need and the amount of force that was used, [and] the extent of injury

4    inflicted." *Whitley*, 475 U.S. at 321.

5         Defendants contend they used only the amount of force necessary to subdue and gain

6    control over Plaintiff, who was resisting staff, refusing to comply with orders to submit to

7    handcuffs and exit his cell, and struggling and assaulting staff to prevent them from restraining

8    him during a cell extraction.  During his deposition, Plaintiff readily admitted that he (1) blocked

9    the food/cuff port with his mattress when he saw that a cell extraction was forthcoming, (2) threw

10   the mattress down and used his whole body against the shield when Defendants entered his cell,

11   (3) refused to lie down on the ground with his hands behind his head because he "didn't want to

12   subject [himself] to being beaten without first putting up a fight; and besides pushing against the

13   shield, he was "going to do whatever it took to fight [the officers] off," including hitting, kicking,

14   biting, head-butting, spitting, "elbowing, kneeing, and pushing."  Pl.'s Dep. 130:17-22, 132:13-

15   133:13.  Thus, according to Defendants, Plaintiff admitted that he was actively resisting and

16   struggling with Defendants Franco and Picazo, and that such admission establishes that the

17   amount of force used was reasonable under the circumstances.  Dkt. 18 at 16-17.  However,

18   Plaintiff also testified that he was resisting the officers only to prevent Defendants Franco and

19   Picazo from punching him.  Pl.'s Dep. 143:18-23; 145:3-10, 147:15-20, 148:2-16.  In addition,

20   evidence exists that after Plaintiff's arms were behind his back and he had been restrained,

21   Defendants Franco and Picazo punched him "15 times" even though Plaintiff allegedly was not

22   resisting.  *Id.* 150: 11-23.  Thus, there is a genuine issue of material fact regarding whether

23   Defendants Franco's and Picazo's use of force was reasonable under the circumstances.

24        As for Defendants Poodry and Aragon, Plaintiff alleges that they were present and

25   personally participated in the deprivation of his constitutional rights.  Plaintiff testified that he did

26   not know whether Defendant Poodry was one of the correction officers who "hit" him after he had

27   fallen backwards into his cell.  Pl.'s Dep. 153:16-25.  The record shows that Defendant Poodry

28   was present at the scene, and he was the sergeant on duty.  *Id.* at 153:14-15; Poodry Decl. ¶¶ 4, 17-

*United States District Court*
*Northern District of California*

15

30.  Defendant Aragon was also present at the scene.  Aragon Decl. ¶¶ 4-18.  Plaintiff claims that after the officers entered his cell, Defendant Aragon somehow wound up lying on Plaintiff's back and started choking him. Pl.'s Dep. 143:24-145:2.  Evidence also exists that Defendant Aragon continued to lie on Plaintiff's back even after he was restrained, and only lifted off Plaintiff after Lieutenant Martinez arrived.  *Id.* 164:24-25.  Meanwhile, Defendant Aragon claims that he was the first one inside the cell, and the forward momentum carried him forward, causing him to trip on the mattress and to fall on top of Plaintiff.  Aragon Decl. ¶ 14.  Plaintiff attempted to turn towards his right side by thrashing his upper body and "continuing to be combative."  *Id.* ¶ 15. Defendant Aragon assisted Defendant Picazo in handcuffing Plaintiff by using the shield and his body weight to force Plaintiff down onto his stomach so that he could reach under the shield and gained control of Plaintiff's left hand.  Aragon Decl. ¶ 16.  Given Defendants Poodry's and Aragon's alleged conduct and proximity to the incident, a trier of fact could find that they were "integral" participants in the incident.  *See Bravo v. City of Santa Maria*, 665 F.3d 1076, 1089-90 (9th Cir. 2011) ("Section 1983 liability extends to those who perform functions 'integral' to [a constitutional deprivation], even if their individual actions do not themselves rise to the level of a constitutional violation.").  Defendants Poodry and Aragon also may be subject to liability for failing to intercede.  *See Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) ("[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen.").

With regard to Defendant Valles, Plaintiff claims that she was present at the scene and allegedly twisted his legs while putting on the leg restraints.  Pl.'s Dep. 156:19-157:23, 159:6-16. However, Plaintiff also testified that he was lying with his stomach on the floor, and he could not see Defendant Valles.  *Id.*  Meanwhile, Defendants presented evidence that it was in fact Defendant Franco who took control of Plaintiff's legs and placed leg restraints on them.  Franco Decl. ¶ 19.  Defendants have also provided evidence purportedly showing that Defendant Valles was not involved in the incident because her name was not included in Lieutenant Martinez's

1   incident report.  *See* Hill Decl., Ex. B, Dkt. 26-2 at 3.[9]  The report is insufficient to prove a fact.

2   Defendant Valles did not submit a declaration herself verifying that she was not present at the

3   scene.  In contrast, Plaintiff claims that he saw Defendant Valles behind the shield and recognized

4   her voice even though he did not see her when he "felt both of [her] hands twisting [his] legs."

5   Pl.'s Dep. 156:19-157:23, 159:6-16; Dkt. 34 at 5.  Plaintiff also testified that while he was lying

6   on his stomach, he could have been kicked by Defendant Valles.  Pl.'s Dep. 162:19-163:3.  This

7   factual dispute likewise precludes summary judgment for Defendant Valles.  Furthermore, if she

8   was indeed present at the scene, Defendant Valles also may be subject to liability for failing to

9   intercede.  *See Cunningham*, 229 F.3d at 1289.

10       The above notwithstanding, the Court finds that Defendants are entitled to summary

11  judgment with respect to Plaintiff's excessive force claim against Defendant Baez.  On the date of

12  the incident, Defendant Baez worked as a control booth operator for Building D2, where Plaintiff

13  was housed.  Baez Decl. ¶ 4.  Plaintiff does not allege or offer any evidence that Defendant Baez

14  used excessive force against him.  Instead, Plaintiff claims that Defendant Baez "could've

15  prevented this whole incident from taking place easily" by not allowing Defendants into his cell

16  and that Defendant Baez is liable "because he had a realistic opportunity to intervene and prevent

17  or curtail the violation but failed to do so."  Dkt. 34 at 3.  This evidence is insufficient to create a

18  material issue of fact as to whether Defendant Baez could have foreseen and interceded in any

19  resulting use of force.   To the extent that Plaintiff also claims that Defendant Baez was liable for

20  simply opening the cell door, the record shows that Plaintiff concedes that Defendant Baez opened

21  the door at one of the other Defendants' (Defendant Poodry's) direction.  *Id.*  Meanwhile,

22  Defendants have presented evidence confirming that Defendant Baez was not involved in the

23  alleged use of force against Plaintiff because he was inside the control booth.  Baez Decl. ¶¶ 9-14.

24  Defendant Baez also denies witnessing the other Defendants use force on Plaintiff because he

25  "could not see into [Plaintiff's] cell from the C-Section control panel."  *Id.* ¶ 15.  Defendant Baez

26

27       [9] An incident report cannot alone prove a fact as it is classic hearsay.  For instance,
compare discrepancies in the listing of "witnesses" in the reports submitted by Defendants Franco,

28  Picazo, Poodry, Aragon, and Baez.  *Compare* Dkts. 21-1 at 2, 22-1 at 2,  23-1 at 2, 24-1 at 2, 25-1
at 2.

United States District Court
Northern District of California

17

claims that his only involvement in the incident was opening Plaintiff's cell door from the control booth because Defendant Poodry ordered him to do so based on a "Code 1" (non-responsive inmate). *Id.* ¶¶ 9-11. Defendant Baez observed Defendant Aragon use his shield to "push[] [Plaintiff] back into his cell . . . [and] [Defendants] Picazo and Franco followed [Defendant] Aragon's forward momentum into the cell." *Id.* ¶ 12. Defendant Baez claims he could not see anything past that point. *Id.* ¶ 13. Thus, the evidence presented does not create a dispute of fact as to whether Defendant Baez knew or had a reason to know that Plaintiff's constitutional rights were being violated or show that that he had an opportunity to intercede. *See Cunningham*, 229 F.3d at 1289. Accordingly, the Court finds no genuine issue of fact as to whether this defendant used excessive force or failed to intercede when such force was used against Plaintiff. The Court finds that Defendant Baez is entitled to summary judgment on Plaintiff's claim of excessive force.

### 2. Qualified Immunity

Alternatively, Defendants argue that they are entitled to qualified immunity as to Plaintiff's claim of excessive force. Dkt. 18 at 24-27. The defense of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an individual official is entitled to qualified immunity, the Court must determine whether (1) the official violated a constitutional right and (2) the constitutional right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the particular situation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Viewing the evidence in a light most favorable to Plaintiff, the facts presented could reasonably support a showing of the use of excessive force (or liability for the failure to intercede) in violation of Plaintiff's constitutional rights against Defendants Aragon, Franco, Picazo, Poodry, and Valles. As to the second inquiry for qualified immunity, Defendants do not dispute that the right to be free from excessive force was clearly established at the time of the incident, but instead argue that their conduct was reasonable under the circumstances. However, as mentioned above, the facts surrounding these Defendants' use of force and opportunity to intercede are disputed.

1   Therefore, Defendants are not entitled to qualified immunity.  *See Sinaloa Lake Owners Ass'n v.*

2   *City of Simi Valley*, 70 F.3d 1095, 1099 (9th Cir. 1995) ("If there are genuine issues of material

3   fact in issue relating to the historical facts of what the official knew or what he did, it is clear that

4   these are questions of fact for the jury to determine."); *accord Johnson v. Bay Area Rapid Transit*

5   *Dist.*, 724 F.3d 1159, 1170 (9th Cir. 2013) ("given the factual dispute before it, which must be

6   resolved by a jury, the district court could not have properly granted Mehserle qualified

7   immunity").  Accordingly, their motion for summary judgment is DENIED as to Plaintiff's Eighth

8   Amendment claim against Defendants Aragon, Franco, Picazo, Poodry, and Valles.

9   **III.     PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

10          In the caption of his opposition, Plaintiff has included the title, "Opposition to

11  Defendants['] summary judgment motion and Plaintiff's counter-summary judgment motion

12  against the Defendants."  Dkt. 34 at 1.  However, the Court notes that Plaintiff does not include

13  any further arguments in support of his cross-motion.  *See* Dkt. 34.  He does not provide a separate

14  statement or even a list of undisputed facts that establishes each element of his excessive force

15  claim against each Defendant.  In the abundance of caution, the Court has construed this filing as a

16  cross-motion for summary judgment.

17          In resolving Defendants' motion for summary judgment, and in considering whether a

18  triable issue of fact exists, the Court has reviewed the evidence and arguments in the cross-motion,

19  which consists more of his arguments in opposition to Defendants' motion for summary judgment.

20  To the extent that such evidence and argument supports Plaintiff's cross-motion, the cross-motion

21  fails for the same reasons Defendants' motion for summary judgment does as to the excessive

22  force claim against Defendants Aragon, Franco, Picazo, Poodry, and Valles.  If the facts were

23  taken in the light most favorable to Defendants, as is required by *Leslie*, 198 F.3d at 1158,

24  Defendants have submitted evidence that the force used during this incident was in response to an

25  inmate who was combative and resisting during a cell extraction.  However, the parties offer

26  crucially different versions of events.  Because genuine disputes of material facts exist, Plaintiff's

27  cross-motion for summary judgment is DENIED as to his excessive force claims against these

28  Defendants.  Dkt. 34.

United States District Court
Northern District of California

19

Meanwhile, the Court has determined that the evidence Plaintiff has presented as to Defendant Baez does not defeat Defendants' motion for summary judgment as to the excessive force claim against this Defendant.  Having determined that Defendant Baez is entitled to summary judgment as a matter of law, Plaintiff's cross-motion for summary judgment as to his excessive force claim against this Defendant is necessarily DENIED. Dkt. 34.

**IV.    CONCLUSION**

For the reasons outlined above, the Court rules as follows:

1.      Plaintiff's "Motion to Exclude Off the Record the 6-9-16 Deposition of Plaintiff, and the 7-19-16 Correction Letter of His 6-9-16 Deposition" is DENIED. Dkt. 32.

2.      Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Dkt. 18.  The motion is GRANTED as to Plaintiff's Eighth Amendment claim against Defendant Baez.  The motion is DENIED as to Plaintiff's Eighth Amendment claim against Defendants Aragon, Franco, Picazo, Poodry, and Valles.

3.      Plaintiff's cross-motion for summary judgment is DENIED. Dkt. 34.

4.      The Northern District of California has established a Pro Se Prisoner Settlement Program.  Certain prisoner civil rights cases may be referred to a Magistrate Judge for a settlement conference.  The Court finds that a referral is in order as to Plaintiff's excessive force claim. Thus, this case is REFERRED to Magistrate Judge Nandor Vadas for a settlement conference. The conference shall take place within sixty (60) days of the date of this Order, or as soon thereafter as is convenient to the Magistrate Judge's calendar.  Magistrate Judge Vadas shall coordinate a time and date for the conference with all interested parties and/or their representatives and, within ten (10) days after the conclusion of the conference, file with the Court a report of the result of the conference.  The Clerk of the Court shall provide a copy of this Order to Magistrate Judge Vadas.

5.      If this matter does not settle, then this case will proceed to trial.

6.      When a final judgment is entered, it will include a judgment in favor of Defendant Baez and against Plaintiff.

7.      This Order terminates Docket Nos. 18, 32, and 34.

IT IS SO ORDERED.

Dated: March 13, 2017

_____
YVONNE GONZALEZ ROGERS
United States District Judge

United States District Court
Northern District of California